**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BYD COMPANY LTD., ) | |
| ) | |
|    Plaintiff, ) | |
| ) | |
|      v. ) | Civil Action No. 20-cv-03458-TNM |
| ) | |
| ALLIANCE FOR AMERICAN ) | |
| MANUFACTURING, et al., ) | |
| ) | |
|    Defendants. ) | |
| ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

SUMMARY OF BYD'S COMPLAINT AND PERTINENT BACKGROUND ......................... 2

ARGUMENT ......................................................................................................... 5

    I.    This Court Lacks Subject Matter Jurisdiction Because BYD's Complaint
        Fails to Plausibly Allege An Amount in Controversy in Excess of $75,000 ......... 5

        A.    Federal Rule of Civil Procedure 12(b)(1) ................................................. 5
        B.    BYD's Allegation of "Reputational Damages" is Insufficient to
               Support a Valid Claim ........................................................................... 6
        C.    BYD Does Not, Because It Cannot, Allege Lost Profits Caused By
               AAM's Statements ............................................................................... 8

    II.    BYD's Complaint Fails to State a Claim, and Must Be Dismissed Under
        Rule 12(b)(6) ........................................................................................... 9

        A.    Applicable Legal Standards .................................................................... 9

               i.     Federal Rule of Civil Procedure 12(b)(6) ..................................... 9
               ii.    Elements of a Defamation Claim ................................................ 10

        B.    BYD Was Required to Plead That AAM and the Individual
               Defendants Each Acted With Actual Malice Because BYD is a
               Public Figure ...................................................................................... 11

               i.     A Public Controversy Existed ..................................................... 13
               ii.    BYD Played a "Public Role" in the Controversy ......................... 15
               iii.   The Alleged Defamation Was Germane ...................................... 16

        C.    BYD's Complaint Fails to Adequately Plead Actual Malice ................. 17

               i.     The Complaint Itself Confirms That AAM's "Forced Labor
                     Story" Relies on Reputable Sources, Precluding a Finding
                     of Actual Malice .......................................................................... 18
               ii.    AAM's "State Control Story" and Press Release Relied on
                       Reputable Sources, Precluding a Finding of Actual Malice ........ 22

        D.    BYD Fails to Validly Allege Any of the Three Statements Were
               Made With Actual Malice ..................................................................... 25

    III.   The Allegations in BYD's Complaint Related to the October 2019 Press
        Release Are Time Barred ........................................................................... 26

    IV.   The District of Columbia's Anti-SLAPP Statute Mandates Dismissal. ............. 28

        A.    D.C. Anti-SLAPP Statute ..................................................................... 28
        B.    This Court Should Invoke the D.C. Anti-SLAPP Statute ..................... 30

CONCLUSION ...................................................................................................... 33

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbas v. Foreign Policy Grp.*,
   783 F.3d 1328 (D.C. Cir. 2015) ........................................................................ 32

*Abhe & Svoboda, Inc. v. Chao*,
   508 F.3d 1052 (D.C. Cir. 2008) ........................................................................ 10

*Bronner ex rel. Am. Studies Assoc. v. Duggan*,
   962 F.3d 596 (D.C. Cir. 2020) ........................................................................... 6

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................... 10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................................................... 10

*BYD Company Ltd. v. Vice Media LLC*,
   No. 1:20-cv-03281 (S.D.N.Y. filed Apr. 27, 2020) ......................................... 32

*Competitive Enter. Inst. v. Mann*,
   150 A.3d 1213 (D.C. 2016) ........................................................................ 31, 32

*Demissie v. Starbucks Corp. Office & Headquarters*,
   19 F. Supp. 3d 321 (D.D.C. 2014) ................................................................... 10

*Deripaska v. Associated Press*,
   282 F. Supp. 3d 133 (D.D.C. 2017) .................................................................. 11

*Didban v. Pompeo*,
   435 F. Supp. 3d 168 (D.D.C. 2020) ................................................................. 10

*Ellis v. Time, Inc.*,
   No. CIV. A.94-1755 (NHJ), 1997 WL 863267 (D.D.C. Nov. 18, 1997) ............... 13

*Erie Ry. Co. v. Tompkins*,
   304 U.S. 64 (1938) ........................................................................................... 29

*\*Fairbanks v. Roller*,
   314 F. Supp. 3d 85, 89 (D.D.C. 2018) .............................................. 10, 11, 12, 31

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ......................................................................................... 26

*Grand Lodge of Fraternal Order of Police v. Ashcroft*,
185 F. Supp. 2d 9 (D.D.C. 2001) ........................................................................ 6

*Gustave-Schmidt v. Chao*,
226 F. Supp. 2d 191 (D.D.C. 2002) ................................................................... 19

*Hi-Tech Pharm., Inc. v. Hahn*,
No. 19-cv-1268 (RBW), 2020 WL 3498588 (D.D.C. June 29, 2020) ................... 6

*Hogan v. Winder*,
762 F.3d 1096 (10th Cir. 2014) ......................................................................... 23

*Hourani v. Psybersolutions LLC*,
164 F. Supp. 3d 128 (D.D.C. 2016) .............................................................. 18, 26

*Jankovic v. Int'l Crisis Group*,
822 F.3d 576 (D.C. Cir. 2016) ........................................................................... 17

*Jankovic v. Int'l Crisis Grp.*,
494 F.3d 1080 (D.C. Cir. 2007) ......................................................................... 27

*Jerome Stevens Pharm., Inc. v. FDA*,
402 F.3d 1249 (D.C. Cir. 2005) ...................................................................... 3, 6

*Kahl v. Bureau of Nat'l Affairs, Inc.*,
856 F.3d 106 (D.C. Cir. 2017) ............................................................... 12, 16, 17

*Kaspersky Lab, Inc. v. Dep't of Homeland Sec.*,
909 F.3d 446 (D.C. Cir. 2018) ....................................................................... 7, 8

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
838 F.2d 1287 (D.C. Cir. 1988) .................................................................... 11, 18

*Martin Marietta Corp. v. Evening Star Newspaper Co.*,
417 F. Supp. 947 (D.D.C. 1976) .......................................................................... 7

*Mass. Lobstermen Assoc. v. Ross*,
349 F. Supp. 3d 48 (D.D.C. 2018) ....................................................................... 6

*McFarlane v. Esquire Magazine*,
74 F.3d 1296 (D.C. Cir. 1996) ........................................................................... 18

*McFarlane v. Sheridan Square Press, Inc.*,
91 F.3d 1501 (D.C. Cir. 1996) ...................................................................... 18, 26

*Mullin v. Wash. Free Weekly, Inc.*,
785 A.2d 296 (D.C. 2001) .................................................................................. 27

*Nunes v. WP Co. LLC*,
No. 20-CV-01403 (APM), 2020 WL 7668900 (D.D.C. Dec. 24, 2020) ............................... 18

*Paleteria la Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*,
247 F.Supp.3d 76 (D.C. Cir. 2017) .................................................................................. 24

*Q. Intern. Courier, Inc. v. Seagraves*,
1999 WL 1027034 ............................................................................................................. 23

*Saudi Am. Pub. Relations Affairs Comm. v. Inst. for Gulf Affairs*,
242 A.3d 602 (D.C.) ................................................................................................... 29, 30

*Slate v. Pub. Def. Serv. for the D.C.*,
31 F. Supp. 3d 277 (D.D.C. 2014) .................................................................................. 20

*\*Szymkowicz v. Frisch*,
No. 19-cv-3329, 2020 WL 4432240 (D.D.C. July 31, 2020) .................................................. 8

*Tah v. Glob. Witness Publ'g, Inc.*,
No. 19-7132 (D.C. Cir. filed Oct. 25, 2019) ...................................................................... 32

*Trudeau v. Fed. Trade Comm'n*,
456 F.3d 178 (D.C. Cir. 2006) ........................................................................................ 10

*United States v. Flynn*,
No. 17-cv-232, 2020 WL 7230702 (D.D.C. Dec. 8, 2020) ............................................ 11, 15

*\*Waldbaum v. Fairchild Pub., Inc.*,
627 F.2d 1287 (D.C. Cir. 1980) .................................................................................. 12, 13

*Wallace v. Skadden, Arps, Slate, Meagher & Flom*,
715 A.2d 873 (D.C. 1998) ............................................................................................... 27

*Wu v. Stomber*,
883 F. Supp. 2d 233 (D.D.C. 2012) ............................................................................... 3, 10

**Statutes**

28 U.S.C. § 1332 ................................................................................................................... 5

D.C.Code § 12-301 ............................................................................................................. 27

D.C. Code § 16-5501 .................................................................................................... 29, 30

D.C. Code § 16-5502 .................................................................................................... 29, 30

D.C. Code § 16-5504 ........................................................................................................ 29

Defendants Alliance for American Manufacturing ("AAM"), Scott Norman Paul, Cathalijne Adams, and Matthew McMullan (collectively, "Defendants") respectfully submit this Memorandum in support of their Motion to Dismiss Plaintiff BYD Company LTD.'s ("BYD" or "Plaintiff") Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), or, in the alternative, pursuant to the Code of the District of Columbia § 16-5501, *et seq*.

## INTRODUCTION

AAM is a non-profit organization that advocates in favor of American-made products and manufacturers. Compl. ¶ 2. The individual Defendants are employees of the non-profit. *Id.* at ¶¶ 7-9. Plaintiff BYD is a China-based company that is "one of the world's largest manufacturers and suppliers of electric vehicles." *Id.* at ¶ 1. BYD asks this Court, in its two-count Complaint asserting defamation claims, to censure AAM and its employees for three statements of public interest made in two blog posts and a press release, each of which was based on reliable sourcing. BYD's claims fail for multiple, independent reasons.

<u>First</u>, as a threshold matter, BYD has failed to meet the pleading standard for asserting subject matter jurisdiction in this Court. Corporations such as BYD are not entitled to "reputation" damages for defamation claims and Plaintiff does not, because it cannot, allege any actual lost profits or monetary damages. The bald allegation that "the amount in controversy exceeds $75,000," *id.* at ¶ 10, "to be proven at trial," *id.* at ¶¶ 27, 32, without more, is insufficient to meet the amount in controversy requirement for subject matter jurisdiction. On this basis alone, BYD's Complaint should be dismissed.

<u>Second</u>, while AAM could (and if necessary will) defend the absolute truth of the statements asserted, even assuming the truth of those allegations, Plaintiff's Complaint fails to state a valid defamation claim, requiring dismissal under Rule 12(b)(6). BYD has failed to assert

1

the basic requirements of a colorable defamation claim under District of Columbia law. BYD, a public figure, has not plausibly alleged, and cannot plausibly allege, that AAM acted with "actual malice" when it published the three sourced statements. As alleged, the statements at issue are based on reliable, public sources and are unable to support the claims asserted. Plaintiff's claims are the type of "unmeritorious defamation suits" that this Court has repeatedly rejected at the pleading stage and that the D.C. Circuit has confirmed have no valid basis to proceed.

Third, BYD's claim as to the October 25, 2019 press release statement, Compl. ¶¶ 21, 30, is untimely and subject to dismissal on this independent, additional basis.

Fourth, and finally, Plaintiff's claim should be dismissed under the D.C. Anti-SLAPP law. As a substantive regulation, the D.C. Anti-SLAPP law should apply in this diversity action and requires not only the dismissal of this action, but also an award to AAM for its reasonable costs and fees. While AAM acknowledges this Court's prior rejection of that position, this case presents unique facts and concessions that support its application.

For each of these independent reasons, more fully examined below, the Court should dismiss BYD's Complaint with prejudice.

## SUMMARY OF BYD'S COMPLAINT AND PERTINENT BACKGROUND

BYD is a multi-billion-dollar corporation based in, and operating out of, the People's Republic of China. Compl. ¶ 1. AAM is a non-profit, non-partisan partnership formed in 2007 by some of America's leading manufacturers and the United Steelworkers. AAM "advocates in favor of American-made products and manufacture[r]s." Compl. ¶ 2. AAM's stated mission is to strengthen American manufacturing and create new private-sector jobs through smart public policies.  About Us, AAM, https://www.americanmanufacturing.org/about-us/.

While AAM conducts its own research, it also publicizes other reputable reports and information related to its public policy practices on its blog. Blog, AAM, https://www.americanmanufacturing.org/blog/. AAM's blog often links to, and summarizes, articles and reports that were published by other reputable sources, including US government-funded think tanks and academics. BYD's Complaint seeks recovery for three statements attributed to Defendants:

First, on March 3, 2020, AAM published a blog post by Ms. Adams that summarized a new report issued by the Australian Strategic Policy Institute, a government-funded think tank, entitled *Uyghurs for sale: "Re-education," forced labour and surveillance beyond Xinjiang* (the "ASPI Report").[1] Compl. ¶ 16, 18. That blog post (referred to by BYD as the "Forced Labor Story") was entitled "Some of the World's Biggest Brands Depend on Forced Labor in China" and "mention[s] BYD as part of a list of companies that purportedly are 'directly or indirectly benefiting from the use of Uyghur workers outside Xinjiang through potentially abusive labour transfer programs as recently as 2019.'" *Id.* at ¶ 16 (quoting ASPI Report), 18. BYD's first cause of action alleges that the statements that BYD "Depends on Forced Labor in China" (as part of the headline for the blog post) and "profits from this forced labor" (in summarizing the ASPI Report) were defamatory.[2] Compl. ¶ 25.

---

[1]     Vicky Xuzhong Xu (with Danielle Cave, Dr. James Leibold, Kelsey Munro, and Nathan Raser), "Uyghurs for sale: 'Re-education,' Forced Labour and Surveillance Beyond Xinjiang," (Policy Brief, Report No. 26/2020), *Australian Strategic Policy Institute* (March 2020). A true and accurate copy of the ASPI Report is attached as Exhibit A to the Declaration of Bezalel A. Stern (the "Stern Declaration"). The remainder of the Exhibits referenced herein are also attached to the Stern Declaration. The Court may consider the ASPI Report, as it is incorporated by reference throughout BYD's Complaint. *See, e.g.*, Compl. ¶¶ 14-19. *See also Wu v. Stomber*, 883 F. Supp. 2d 233, 258 n.14 (D.D.C. 2012).

[2]     Cathalijne Adams, Some of the World's Biggest Brands Depend on Forced Labor in China, AAM (Mar. 3, 2020), https://www.americanmanufacturing.org/blog/some-of-the-worlds-biggest-brands-depend-on-forced-labor-in-china/. A true and accurate copy of the Forced Labor Story is attached to the Stern Declaration as Exhibit B. *See also supra*, note 1.

Second, on May 20, 2020, AAM published a blog post by Mr. McMullan entitled "California has a $1 Billion Contract for PPE with BYD, a Company Controlled by the Chinese State" (referred to by BYD as the "State Control Story"). *Id.* at ¶ 20. The headline concerning BYD's relationship with the People's Republic of China is supported by independent, third-party research in the body of the State Control Story, including links to reputable references.[3] Ex. C.

That connection is further reinforced by statements from U.S. government bodies and officials referenced in the State Control Story that confirm the good faith basis upon which AAM's headline was published. *Id.* BYD's second cause of action alleges that the headline linking BYD to the Chinese State was defamatory. Compl. ¶ 30.

Third, and similarly, the second cause of action also seeks to hold AAM liable for a statement by Mr. Paul in an October 25, 2019 press release (the "Press Release") reporting that "Lawmakers now have irrefutable evidence that CRRC and BYD are simply an arm of China's military government." Compl. ¶¶ 21, 30. In addition to being untimely, the Press Release statement by Mr. Paul relies on independent research and reporting, including (on the face of the statement), comments from US "Lawmakers."[4]

These three, well-supported statements are the sum total of allegedly defamatory statements offered by BYD to stifle AAM's and its employees' speech. Despite conceding that it must meet an "actual malice" standard, Plaintiff's Complaint acknowledges the reliable references

---

[3]      Matthew McMullan, California has a $1 Billion Contract for PPE with BYD, a Company Controlled     by     the     Chinese     State,     AAM     (May     20,     2020), https://www.americanmanufacturing.org/blog/california-has-a-1-billion-contract-for-ppe-with-byd-a-company-controlled-by-the-chinese-state/. A true and accurate copy of the State Control Story is attached to the Stern Declaration as Exhibit C. *See also supra*, note 1.

[4]      Congress Must Act After New Evidence Links CRRC and BYD to Chinese Government and Military, AAM (Oct. 25, 2019), https://www.americanmanufacturing.org/press-release/congress-must-act-after-new-evidence-links-crrc-and-byd-to-chinese-government-and-military/. A true and accurate copy of the Press Release is attached to the Stern Declaration as Exhibit D. *See also supra*, note 1.

upon which each of the statements at issue were based, undermining any valid allegation of malice. BYD makes no factual allegations that, if proven, could support that AAM or any of the individual Defendants acted with actual malice. BYD alleges no actual damages, lost profits, or monetary injury caused by AAM's statements, seeking to recover solely for improper "reputation" damages.

**ARGUMENT**

**I.     This Court Lacks Subject Matter Jurisdiction Because BYD's Complaint Fails to Plausibly Allege An Amount in Controversy in Excess of $75,000**

**A.  Federal Rule of Civil Procedure 12(b)(1)**

Plaintiff's Complaint fails to meet the threshold pleading standard of asserting a valid basis for this Court's jurisdiction to hear this dispute. BYD has not alleged any violation of federal law. Instead, Plaintiff attempts to invoke this Court's jurisdiction only by way of diversity. *See* Compl. ¶ 10.[5] It is black letter law that federal courts only retain diversity jurisdiction where there is both complete diversity of citizenship and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a). BYD's Complaint has failed to establish—or even to plausibly allege—that it has been damaged in excess of $75,000 by any of the three statements at issue. As such, this Court has no subject matter jurisdiction, and must dismiss the Complaint pursuant to Rule 12(b)(1).

"Article III of the Constitution prescribes that federal courts are courts of limited subject-matter jurisdiction and have the power to decide only those cases over which Congress grants jurisdiction." *Bronner ex rel. Am. Studies Assoc. v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020) (quotation omitted). "Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure

---

[5]     BYD incorrectly asserts 28 U.S.C. § 1332(a)(1) as the basis for this Court's jurisdiction. Compl. ¶ 10. As BYD alleges that it is a foreign (Chinese) corporation, this Court would have jurisdiction, if it all, only under 28 U.S.C. § 1332(a)(2). At a minimum, that error requires amendment; however, AAM provides the remainder of its argument under Rule 12(b)(1) as if the basis for diversity jurisdiction had been alleged under subsection (a)(2).

that it is acting within the scope of its jurisdictional authority." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Due to the Court's heightened obligation "[u]nder this Rule, Plaintiffs bear the burden of <u>proving</u> that the Court has subject-matter jurisdiction to hear their claims." *Mass. Lobstermen Assoc. v. Ross*, 349 F. Supp. 3d 48, 54 (D.D.C. 2018) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)) (emphasis in original). In evaluating a 12(b)(1) motion, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Hi-Tech Pharm., Inc. v. Hahn*, No. 19-cv-1268 (RBW), 2020 WL 3498588, at *3 (D.D.C. June 29, 2020) (quotation omitted). In deciding a Rule 12(b)(1) motion to dismiss for lack of jurisdiction, a district court may consider materials outside the pleadings. *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### B. BYD's Allegation of "Reputational Damages" is Insufficient to Support a Valid Claim

By its plain terms, the Complaint fails to plausibly allege that the supposedly defamatory statements at the heart of its Complaint caused Plaintiff to sustain any actionable damage that can serve as the basis for its unsupported allegation that the amount in controversy exceeds $75,000.

In total, the Complaint contains four scant allegations concerning damages. First, Plaintiff baldly alleges that "the amount in controversy exceeds $75,000." Compl. ¶ 10. Second, Plaintiff claims without any articulated basis that "Defendants' attacks on BYD are intended to damage, and have in fact caused substantial damage, to BYD's reputation." *Id.* at ¶ 22. Third, Plaintiff incorporates into each cause of action the unsupported allegation that "Defendants' statements . . . were and are . . . highly damaging to BYD's reputation and business." *Id.* at ¶¶ 25, 30. Finally, Plaintiff posits that "BYD has been damaged in an amount to be proved at trial, and which exceeds $75,000." *Id.* at ¶¶ 27, 32.

6

Reputational damages are not recoverable in a corporate plaintiff's defamation case. Rather, a corporation suing for defamation "may only recover actual damages in the form of lost profits." *Kaspersky Lab, Inc. v. Dep't of Homeland Sec.*, 909 F.3d 446, 462 (D.C. Cir. 2018) (quoting *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1156 (D.C. Cir. 1985)); *see also Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F. Supp. 947, 955 (D.D.C. 1976) ("The law of libel has long reflected the distinction between corporate and human plaintiffs by limiting corporate recovery to damages in the form of lost profits.").

The D.C. Circuit recently explained why reputational damages to corporations are not actionable when it comes to defamation claims:

> [T]he stain of a "brand of infamy or disloyalty" matters most to flesh-and-blood humans. These are people who, most likely, have but one country of citizenship—a country in which they exercise civic privileges available exclusively to living individuals, such as voting, running for office, or serving in the armed forces. They are people who have neighbors and colleagues and communities in whose good graces they hope to remain. And they are people who have families and friends whose own reputations and happiness are tied, at least in part, to their own.
>
> Corporations are very different. To be sure, corporations may derive substantial financial value from their brands' reputations. But that is precisely the point: reputation is an asset that companies cultivate, manage, and monetize. It is not a quality integral to a company's emotional well-being, and its diminution exacts no psychological cost . . . Unlike defamation actions brought by individuals, because a corporation has no personal reputation, libel action[s] brought on behalf of corporation[s] fall far short of implicating the essential dignity and worth of every human being."

*Kaspersky Lab, Inc.*, 909 F.3d at 461–62 (quotations omitted). For that reason, the *Kaspersky* Court affirmed the dismissal of a claim brought by a Russian-based cybersecurity company, finding that the only damages that could be asserted were materially limited to monetary profits and not reputation.

Here, BYD's amorphous and unsupported allegation of "reputational damages" are likewise invalid.

### C. BYD Does Not, Because It Cannot, Allege Lost Profits Caused By AAM's Statements

BYD has not provided factual allegations to support any valid claim for damages. BYD has not explained, and cannot explain, how the three statements at issue caused it ***any*** actual damages, much less established the $75,000 threshold required to bring suit in this Court. BYD's silence is fatal to its claim.

Chief Judge Howell's recent dismissal, in *Szymkowicz v. Frisch,* of similarly deficient damage allegations brought against the operator of a legal ethics blog is instructive. No. 19-cv-3329, 2020 WL 4432240 (D.D.C. July 31, 2020). There, the attorney plaintiff alleged damages to his "career and reputation" in "an amount to be determined at trial" that were allegedly attributable to five blog posts published by the defendant over a six-year period. *Id.* at *1, *5. Even considering the reputational damages that are applicable to an individual, but not a corporate plaintiff, the Court dismissed the plaintiff's claims under Rule 12(b)(1). The Court held that a plaintiff invoking diversity jurisdiction "must to do more than vaguely assert . . . economic and reputational damages. Rather, ***he must explain how he has suffered those harms***." *Id.* at *6 (emphasis added) (quotations omitted). Finding none alleged, Chief Judge Howell granted the motion to dismiss.

BYD has not alleged that it lost any profits as a result of any of the three statements at issue in its Complaint. Nor can it do so. The first two purported defamatory statements appeared in October 2019, and March 2020. *See* Exs. B, D. The third allegedly defamatory statement, which appeared in May 2020, discusses BYD's entrance into *a billion dollar contract* with the State of California. Ex. C. Such a lucrative contract objectively undermines any credible allegation that the earlier AAM statements harmed BYD's profits had BYD even made such a claim (which it did not). And (despite AAM's May blog post) that billion-dollar California contract for BYD was

followed by a second contract, in July 2020, with the State of California for $316 million worth of PPE.[6] The public record does not reflect a good faith basis for alleging lost profits by BYD.

BYD's pleading failures here are the same as in *Symkowicz*. *Compare id.* at *5 (alleging damages to "career and reputation" in "an amount to be determined at trial") *and* Compl. at ¶¶ 25, 27 (alleging damages to "reputation and business . . . in an amount to be proven at trial.") Accordingly, the same result is warranted and the Complaint should be dismissed. Indeed, as BYD has failed to validly allege that the amount in controversy is at least $75,000, its Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

## II.    BYD's Complaint Fails to State a Claim and Must Be Dismissed Under Rule 12(b)(6)

### A.  Applicable Legal Standards

#### i.      Federal Rule of Civil Procedure 12(b)(6)

Even if the Court had subject matter jurisdiction to consider BYD's Complaint (which it does not), the Complaint should be dismissed for the independent reason that it fails to state a colorable defamation claim. "Early resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) 'not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive.'" *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 89 (D.D.C. 2018 (quoting *Palin v. New York Times Co.*, 264 F. Supp. 3d 527, 533 (S.D.N.Y. 2017).).

Federal Rule of Civil Procedure 12(b)(6) provides that an action must be dismissed where a complaint fails "to state a claim upon which relief can be granted." In order to overcome a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a

---

[6]      <u>Second Equipment Master Supply Purchase Order Agreement</u>, Government of California, <u>https://files.covid19.ca.gov/pdf/BYD-Motors-LLC-OES-5.pdf</u> (the "Purchase Order"). A true and accurate excerpt of the Purchase Order is attached to the Stern Declaration as Exhibit E.

claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). A valid complaint must allege facts which "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court is "not bound to accept as true a legal conclusion couched as a factual allegation" in evaluating a plaintiff's purported facts. *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quotation omitted).

In adjudicating a Rule 12(b)(6) motion to dismiss, the Court is limited to considering the matters raised within the complaint. That does not mean, however, that the Court is limited to the four corners of the complaint itself. The Court may also consider documents incorporated by reference into the complaint, but introduced only as an exhibit attached to the defendant's motion to dismiss. *Wu v. Stomber*, 883 F. Supp. 2d 233, 258 n.14 (D.D.C. 2012) ("The Court, on a motion to dismiss, may consider 'any documents either attached to or incorporated [by reference] in the complaint.'").[7] Likewise, the court may consider "documents attached to a motion to dismiss for which no party contests the authenticity." *Demissie v. Starbucks Corp. Office & Headquarters*, 19 F. Supp. 3d 321, 324 (D.D.C. 2014). Finally, a court may take judicial notice of matters of public record. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2008). Matters of public record include, *inter alia*, congressional testimony, *Didban v. Pompeo*, 435 F. Supp. 3d 168, 177 n.5 (D.D.C. 2020), and materials posted on a public official's social media account, *United States v. Flynn*, No. 17-cv-232, 2020 WL 7230702, at *6 n.6 (D.D.C. Dec. 8, 2020).

### ii.    Elements of a Defamation Claim

"Under District of Columbia law, a defamation claim requires: (1) a false and defamatory statement; (2) published without privilege to a third party; (3) made with the requisite fault; and

---

[7]    The 2019 press release as well as the two 2020 blog posts that serve as the predicates for BYD's allegations are not attached to BYD's Complaint, but are incorporated by reference. *See, e.g.*, Compl. ¶¶ 18-21. Those documents are provided here to provide complete context for BYD's claims. Exs. B-D.

(4) damages." *Fairbanks*, 314 F. Supp. 3d at 90 (D.D.C. 2018) (citing *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001)). The "requisite fault" standard for a public figure, such as BYD, is to establish actual malice by "clear and convincing evidence." *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988). As a public figure, BYD

> must establish that the defendant made the allegedly defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." [*New York Times v.* ]*Sullivan*, 376 U.S. [254,] 280, 84 S.Ct. 710. Because free debate inevitably leads to some mistaken statements and punishment of these statements would chill the freedom of speech, reckless disregard requires a "high degree of awareness of . . . probable falsity." *Garrison v. La.*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

*Fairbanks*, 314 F. Supp. 3d at 92.

The "actual malice" standard is a high bar. As explained below, BYD's Complaint utterly fails to clear its hurdle. As such, even if the statements at issue are assumed to be false and defamatory, BYD's defamation claims must be dismissed.

### B. BYD Was Required to Plead That AAM and the Individual Defendants Each Acted With Actual Malice Because BYD is a Public Figure

It is beyond debate that BYD is a public figure for purposes of the claims asserted here, and therefore was required to plead that each of Defendants acted with actual malice in making the allegedly defamatory statements. Public figures may be general or limited-purpose. Whether a plaintiff is a public figure is a question of law routinely decided by a court at the motion to dismiss stage. *See, e.g.*, *Deripaska v. Associated Press,* 282 F. Supp. 3d 133, 142 (D.D.C. 2017) (deciding plaintiff is a limited-purpose public figure and dismissing on a motion to dismiss for failure to plead actual malice)*.* "Public figures are those who have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. Because of the prominent role that those individuals have sought for themselves on certain issues, their views and actions with respect to public issues and events are often of as much concern to the

citizen as those of public officials." *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 114 (D.C. Cir. 2017) (quotations omitted). "More commonly, public figures exercise that degree of power and influence on a limited range of topics or issues and are therefore known as 'limited-purpose public figures.' The law treats those persons as public figures, but only when it comes to the particular public controversies with which they are associated." *Id.* (citing *Jankovic v. Int'l Crisis Group*, 822 F.3d 576, 584 (D.C. Cir. 2016)).

The Complaint itself effectively concedes that BYD is, at the very least, a limited-purpose public figure. At the outset of its eight-page Complaint, BYD describes itself as "one of the world's largest producers and suppliers of electric vehicles." Compl. ¶¶ 1, 12. It notes that it is funded by celebrity investor Warren Buffet. *Id.* at 1. In an effort—albeit a failed one—to meet the pleading standard attributable to a public figure, it includes unsupported, conclusory statements that Defendants acted with "actual malice." *Id.* ¶ 23. Such references concede that, as a public figure, BYD must allege actual malice to state a claim for defamation. Having positioned itself as a public figure, the Court should treat BYD as such. *See Fairbanks*, 314 F. Supp. 3d at 90 (plaintiff "concedes that she is a public figure. Under First Amendment law, this means that she bears a heightened burden on both [falsity and fault].").

In any event, the record confirms that BYD is, at the very least, a limited-purpose public figure. In *Waldbaum v. Fairchild Pub., Inc.*, the D.C. Circuit set out a three-part test to determine whether an entity should be considered a limited-purpose public figure. *See* 627 F.2d 1287, 1296–98 (D.C. Cir. 1980): (1) Did a public controversy exist prior to publication of the allegedly defamatory statement, (2) Did the plaintiff play a role in that controversy, and (3) Was the alleged defamation germane to the plaintiff's participation in the controversy. *See id.* As explained below, BYD qualifies as a limited-purpose public figure under *Waldbaum*.

###### i.        A Public Controversy Existed Prior to Publication

The first prong of *Waldbaum* asks whether a public controversy existed prior to the defendant's publications of the supposedly defamatory statement. *Waldbaum* defines a public controversy as "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum,* 627 F.2d at 1296. A public controversy is pointedly "not a private dispute that just happened to be newsworthy; the controversy [instead must be] of substantial interest to the general public." *Ellis v. Time, Inc.*, No. CIV. A.94-1755 (NHJ), 1997 WL 863267, at *4 (D.D.C. Nov. 18, 1997) (editor was a public figure for purpose of the photographs he sued over because the controversy over those photographs was well known).

Here, BYD's own Complaint confirms that neither AAM nor the individual Defendants created a controversy, but rather were reporting and commenting on BYD's role in existing issues of ongoing national and international significance. AAM's statements clearly speak to some of the most critical matters in America today: The strength of the U.S. manufacturing market; America's ability to compete within the global economy; the actions taken by foreign actors seeking to undercut fair prices; and the horrific human rights violations being enacted on Uyghur minorities within and outside of the Xinjiang province, tainting the global supply chain. Compl. ¶ 22.

There are two relevant public controversies at issue in the statements targeted in the Complaint: (1) the use of Uyghur slave labor in BYD's supply chain, and (2) the relationship between BYD and the government of the People's Republic of China, particularly as it relates to the strength of America's economy and national security. Compl. ¶¶ 25, 30. Both of these controversies predate the allegedly defamatory statements in question, as evidenced by the variety of sources that each of AAM's articles link to in support of its observations and allegations.

BYD's Complaint itself confirms that the potential use of Uyghur slave labor in BYD's supply chain was an existing public topic before AAM's March 3 blog post on that issue. BYD

references the March 1, 2020 ASPI Report and concedes that AAM directly cited the ASPI Report to support the statement that BYD was "profiting from th[e] forced labor" of Uyghur detainees. Compl. ¶ 14 ("On or about March 1, 2020, ASPI published the 'ASPI Report,' which was entitled 'Uyghurs for Sale: "Re-education," forced labour and surveillance beyond Xinjiang.'"); *id.* at ¶ 16 ("The text contains three mentions of BYD. The first two mentions of BYD in the ASPI Report are exactly the same, and mention BYD as part of a list of companies that purportedly are 'directly or indirectly benefiting from the use of Uyghur workers outside Xinjiang through potentially abusive labour transfer programs as recently as 2019.'"); *id.* at ¶ 18 ("The Forced Labor Story purports to be a description of the ASPI Report."). The Forced Labor Story was undisputedly reporting on an existing public controversy.

Rather than creating a new public controversy, AAM's March 3, 2020 blog post was a description of the ASPI Report, and ongoing public discussion concerning the use of forced labor in the supply chain of numerous, prominent corporations. AAM, like dozens of other news, government, and non-profit entities interested in the American business market and international trade issues, reported on the facts identified by the ASPI Report. In reporting on the findings from the ASPI Report, AAM's post was a textbook example of a statement made in connection with an existing public controversy.[8]

Similarly, BYD's relationship with the Chinese State and BYD's impact on American manufacturing have long been in the public spotlight. For example, Senator John Cornyn, the United States Senator for Texas since 2002, tweeted on October 6, 2019 that "China is increasingly a threat to US economy and security: BYD Motors, the U.S. subsidiary of a Chinese electric

---

[8]   BYD has been the subject of allegations concerning the use of salve labor for years. *See, e.g.,* BYD Company Limited Investigative Report, China Labor Watch (June 29, 2011), http://www.chinalaborwatch.org/upfile/2011_10_19/20111019enbyd.pdf (discussing use of forced labor at BYD facilities).

vehicle company is part of a massive 'military-civil fusion strategy,' spearheaded by the Chinese Communist Party, that seeks to expand its its [sic] global manufacturing dominance and get leverage over 'global supply chains, technology flows, and, ultimately, data."[9] Senator Cornyn's publicly-available tweets, sent out to his approximately 290,000 followers, predate AAM's relevant statements and confirm the national prominence of this existing controversy.

BYD's own prior statements further confirm both the accuracy and existence of this controversy. In December 2019, as part of the 2020 National Defense Authorization Act (the "2020 NDAA"), Congress blocked the use of federal money for the purchase of passenger rail cars or buses from state-owned or state-controlled enterprises, including those from China. Public Law 116-92. In a December 10, 2019 response, BYD published a statement criticizing the Act of Congress, which BYD alleged was "targeting BYD."[10]

In sum, because a public controversy existed as to both the potential use of Uyghur slave labor in BYD's supply chain, and the relationship between BYD and the government of the People's Republic of China, prior to publication of the statements at issue, the first prong of *Waldbaum* is satisfied.

### ii.    BYD Played a "Public Role" in the Controversy

After finding that a public controversy existed, under *Waldbaum*, a court must decide whether the plaintiff has "'thrust [itself] to the forefront' of a public controversy 'in order to

---

[9]    Senator John Cornyn (@JohnCornyn), Twitter (October 6, 2019, 5:17 PM EST), https://twitter.com/JohnCornyn/status/1180955136245538816.    This Court may take judicial notice of public officials' tweets and other social media, "as the veracity of [the tweet] can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. *United States v. Flynn*, No. 17-232, 2020 WL 7230702, at *6 n.6 (D.D.C. Dec. 8, 2020) (quoting Fed. R. Evid. 201(b)(2)).

[10]    *BYD Statement on Proposed NDAA Language*, BYD (Dec. 10, 2019), https://en.byd.com/news-posts/byd-statement-on-proposed-ndaa-language/ (last visited Feb. 1, 2021) (the "BYD Statement").

influence the resolution of the issues involved.'" *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 115 (D.C. Cir. 2017) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)). In other words, the Court must decide whether the plaintiff played a "public role" in the controversy. *Id.* "To resolve that question, this Court considers 'the plaintiff's past conduct, the extent of press coverage, and the public reaction to his conduct or statements.'" *Id.* (quoting *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (D.C. Cir. 2003)).

BYD's own statements and press coverage demonstrate the undisputedly public role BYD plays in these existing public controversies. BYD's own Complaint touts its relationship with Warren Buffet and its contracts with various US state and local governments. *See, e.g.,* Compl., ¶ 1. BYD both understands and reasonably expects that it has a public role in the two public controversies at issue here: the use of slave labor by Chinese companies and BYD's relationship with the Chinese State. BYD's Complaint acknowledges that it was specifically named three times in the ASPI Report as a beneficiary of Uyghyr forced labor. Compl. ¶¶ 16-17. BYD was included in the list of companies identified by press and government officials in response to the ASPI Report. Similarly, BYD's relationship with the Chinese government—including the tax incentives it receives from China and the former government officials who rank among its owners—is a matter of public record and consistent reporting. *See, e.g.*, Mark L. Clifford, <u>Chinese Government Subsidies Play Major Part in Electric Car Maker BYD's Rise</u>, Forbes (July 26, 2016), https://www.forbes.com/sites/mclifford/2016/07/26/with-a-little-help-from-its-friends-lavish-chinese-government-help-for-top-electric-car-maker-byd/?sh=26dc285115e2.

Accordingly, the second prong of *Waldbaum* is satisfied.

### iii.    The Alleged Defamation Was Germane

The third prong of *Waldbau*m is also satisfied because the statements by AAM are related to BYD's public role and within the scope of its public presence. "The purpose of the germaneness

inquiry is to ensure that the allegedly defamatory statement—whether true or not—is related to the plaintiff's role in the relevant public controversy. This ensures that publishers cannot use an individual's prominence in one area of public life to justify publishing negligent falsehoods about an unrelated aspect of the plaintiff's life." *Kahl*, 856 F.3d at 115.

The purported defamatory statements are germane. AAM's statements relate directly to BYD's participation in each of these controversies: that forced labor has tainted BYD's supply chain, and that BYD is closely involved with the Chinese State in a manner that calls BYD's independence from the Chinese government into question. *See Jankovic*, 822 F.3d at 589 ("The germaneness test is met because the defamatory statement relates to the individual's role in the public controversy.").

As all three prongs articulated in *Waldbaum* are satisfied, BYD must adequately allege "actual malice" in order to state a valid claim for defamation against AAM. As explained below, BYD fails to do so.

## C. BYD's Complaint Fails to Adequately Plead Actual Malice

The First Amendment requires public figures (general and limited-purpose) suing in defamation to establish, by clear and convincing evidence, that the defendant's fault rises to the level of "actual malice." *Liberty Lobby, Inc.*, 838 F.2d at 1292. "Stated another way, Plaintiff must plead facts that would render it plausible that Defendants 'in fact entertained serious doubts as to the truth of [their] publication.'" *Nunes v. WP Co. LLC*, No. 20-CV-01403 (APM), 2020 WL 7668900, at *4 (D.D.C. Dec. 24, 2020) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

To adequately plead actual malice, a plaintiff must plausibly allege not just that the defamatory publication was false, but that the defendant either "realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Hourani v.*

17

*Psybersolutions LLC*, 164 F. Supp. 3d 128, 141 (D.D.C. 2016). The standard is "subjective," and the plaintiff must allege and prove that the defendant "actually entertained a serious doubt." *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996)). "The standard of actual malice is a daunting one." *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996). Where a publisher relies in good faith on previously published information from reputable sources, a finding of actual malice is precluded as a matter of law. *Sheridan Square Press*, 91 F.3d at 1510. BYD does not even take on this "daunting" standard.

Even taking the allegations in the Complaint as true, BYD has failed to plausibly allege that Defendants published the statements with "actual malice." To the contrary, the statements BYD takes issue with were all reliably sourced, based on independent, widely-known, third-party reporting, and, in the case of two of the statements, previously codified statutory language in the 2020 NDAA enshrining BYD's relationship with the Chinese state. BYD can point to nothing countenancing these truths. And, as set forth more fully below, BYD makes no allegations that, if proven, could establish actual malice.

> ### i.    The Complaint Itself Confirms That AAM's "Forced Labor Story" Relies on Reputable Sources, Precluding a Finding of Actual Malice

BYD's first cause of action challenges two statements made in AAM's March 3, 2020 Forced Labor Story: first, that BYD "Depend[s] on Forced Labor in China" and second, that BYD "profit[s] from this forced labor." Compl. ¶ 25. BYD fails to plead facts that, if proven, could show that either of these statements were made with "actual malice."

The Complaint confirms that in publishing the Forced Labor Story, AAM was relying and reporting upon information from the ASPI Report, published two days prior. *See, e.g.,* Compl., ¶¶

14, 16-18. AAM's reporting on the ASPI Report does not, because it cannot, meet the standard for actual malice.[11]

Further, the Forced Labor Story was not a discussion of BYD or its business practices, but focused on the ASPI Report and the public debate over dozens of international corporations (including BYD) profiting from the use of Uyghur labor in their supply chain. Ex. B. The headline directly paraphrases the fourth paragraph, bolded in the article, that states in full: "A new report[12] identifies 83[13] global brands, including Nike, Gap, Target, Apple, H&M, BMW, Samsung and Huawei, that depend upon factories in China that utilize the forced labor of Chinese ethnic minority Uighurs." *Id*. The sole reference to BYD in the Forced Labor Story is contained in the eighth paragraph, which states, "several known bad actors are also profiting from this forced labor, including CRRC Corporation Limited (CRRC) and Build Your Dreams (BYD)." *Id*. These statements are a factual summary of the information detailed in the ASPI Report. *See, e.g.*, Ex. A, 4-5.

BYD has failed to plead that the statements in the Forced Labor Story—a direct paraphrase of the ASPI Report—were made with actual malice. In fact, the allegations in the Complaint, taken as true, establish the opposite. BYD concedes that the ASPI Report includes "BYD as part of a list of companies that purportedly are directly or indirectly ***benefitting*** from the use of Uyghur workers

---

[11]    While the ASPI Report is referenced throughout the Complaint, BYD tellingly did not attach it as an Exhibit.  The Court can and should consider the ASPI Report incorporated by reference to the Complaint.  "In deciding whether to dismiss a claim under Rule 12(b)(6), the Court may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).

[12]    The word "report" in the Forced Labor Story is highlighted in blue and hyperlinks directly to a copy of the ASPI Report at https://www.aspi.org.au/report/uyghurs-sale. Ex. B.

[13]    At the time of publication, the ASPI Report identified 83 brands. Ex. A, 3.

outside Xinjiang through potentially abusive labour transfer programs." Compl. ¶ 16 (emphasis

added).[14] That fact, alone, is dispositive as to the absence of actual malice.

BYD's Complaint does not, and BYD cannot, cast any credible aspersions on the reliability

of the ASPI Report or Defendants' good faith reliance on it as a reputable source.[15] The ASPI

Report was published by the Australian Strategic Policy Institute, an organization that has been

active since 2001 as an "independent, non-partisan think tank" that counsels the Australian

Government on issues of "defense, security, and strategic policy choices." Ex. A, i. ASPI is funded

by the Australian Government, and received further funding for the ASPI Report by the UK

Foreign and Commonwealth Office, as well as the United States Congress. *Id.* Immediately

preceding the ASPI Report's standard disclaimer that BYD quotes in Paragraph 15 of its

Complaint, the ASPI Report frames its central goal: "This publication is designed to provide

accurate and authoritative information in relation to the subject matter covered." *Id.*[16]

BYD's Complaint mischaracterizes the ASPI Report when it stated that there is, "no actual

factual support in the ASPI Report for any claim that BYD profited from forced labor." *Id.* at ¶ 17.

Not so. The ASPI Report provides factual citations for each of its claims. For example, the

---

[14]    "Benefit" is synonymous with "profit." *Benefit*, *Black's Law Dictionary* (11th ed. 2019) ("n. (14c) 2. 'Profit or gain'"); *Benefit, v.*, *Oxford English Dictionary* (2nd ed. 1989) ("2. intransitive (for reflexive). To receive benefit, to get advantage; to profit."). Although AAM has used different language than the ASPI Report, it has not changed the literal meaning of the report.

[15]    The Court may take judicial notice of the ASPI Report, as it is directly referenced throughout the Complaint. *See*, *e.g.*, Compl. ¶¶ 14-19. "Courts have considered documents attached to motions to dismiss and opposition papers without converting the motion into one for summary judgment when the documents were referenced in the Complaint and were central to the plaintiff's claims." *Slate v. Pub. Def. Serv. for the D.C.*, 31 F. Supp. 3d 277, 287 (D.D.C. 2014).

[16]    The Court may take judicial notice that several prominent publications, including Business Insider, National Review, Vice, and The Guardian, all wrote stories about the ASPI Report in the days following its publication. Many of those stories appeared on March 2, before AAM even published the Forced Labor Story. *See, e.g.* Zachary Evans, China Forced Uighurs to Work in Factories Supplying Nike and Apple: Report, National Review (March 2, 2020), https://www.nationalreview.com/news/china-forces-uighurs-to-work-in-factories-supplying-companies-including-nike-and-apple-report/.

following shows the factual support and citations in the ASPI Report supporting its conclusion that

BYD had Uyghur forced labor workers in its supply chain:

| Claim (ASPI Report at 34) | Support (ASPI Report at 50) |
|---|---|
| On 17 May 2018, 105 Uyghur workers were transferred from Keriy county, Xinjiang, to Hubei Yihong Precision Manufacturing Co. Ltd. in Xianning, Hubei province. | 'Xianning, Hubei, opens up a 'green tunnel' for Xinjiang's organised labour export' . . . United Front of Jingchu . . . via Headlines Express . . ., 18 May 2018, online. [at http://archive.ph/JBAF6] |
| Hubei Yihong Precision Manufacturing Co. Ltd. is a subsidiary of Dongguan Yidong Electronic Co. Ltd and produced precision parts for electronics such as backlights and battery covers. | 'Yidong Overview' . . ., Dongguan Yidong Electronic Co. Ltd . . ., online [at http://www.yidong.com.cn/about_lyd/djja0d.html]. |
| According to their website, Dongguan Yidong Electronic Co. Ltd. suppl[ies] directly to BYD. | 'Collaborative customers' . . ., Dongguan Yidong Electronic Co. Ltd . . . [online at http://www.yidong.com.cn/about_zyd/hzkhee2.html] |

Ex. A, 34, 50. This is only a sample of the level of factual reporting and detailed citation in the 53-

page ASPI Report, which includes 285 endnotes. *Id.*

Finally, the Complaint contains no credible allegations that AAM relied on the ASPI

Report in bad faith.[17] BYD baldly alleges that "AAM linked the ASPI Report to the Forced Labor

Story, and thus must have known that the ASPI Report did not establish that BYD profited in any

way from forced labor." Compl. ¶ 23. That is not a credible conclusion. As detailed above, the

objectively credible, detailed, and well-supported ASPI Report ***does*** lend support for a reasonable

belief that BYD benefits from forced labor in its supply chain, and supports that statement with

---

[17]     To succeed on a claim of defamation, BYD must show not only that the statements were false (which they are not), but also that Defendants had a bad faith subjective belief that the information its reporting was based upon was unreliably false. BYD does not, because it cannot, even seek to present a valid factual basis to support such a conclusion.

citations and specifics. Reliance on credible sources is, as a matter of law, dispositive on the element of actual malice. AAM's accurate publication of the information reported in the ASPI Report, with citations and a hyperlink to the source material, fail to meet the standard for showing Defendants acted "with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan,* 376 U.S. at 280. BYD's allegations do not, because they cannot, meet the high standard for pleading actual malice.

BYD has not alleged that AAM made the statements found in the Forced Labor Story—statements explicitly based on and linked to the ASPI Report—with "actual malice." As such, BYD's First Cause of Action fails to state a colorable defamation claim against AAM and must be dismissed.

### ii.    AAM's "State Control Story" and Press Release Relied on Reputable Sources, Precluding a Finding of Actual Malice

BYD's second cause of action relies on two statements: that BYD was "controlled by the Chinese State" and "an arm of China's military and government." Compl. ¶ 30. Because one of the statements is a non-actionable headline and Plaintiff fails to allege actual malice as to either the State Control Story or the Press Release, BYD's Second Cause of Action must be dismissed under Rule 12(b)(6).

### a.    The State Control Story Statement is a Non-Actionable Headline

As a threshold matter, the allegedly defamatory statement from the "State Control Story" is a non-actionable headline. A headline is nonactionable unless it mischaracterizes the article within which the statement appears. *Q. Intern. Courier, Inc. v. Seagraves*, 1999 WL 1027034, at *4 ("An alleged defamatory headline is not actionable if 'the headline is a fair index of the accurate article with which plaintiff appears.'") (quoting *Burgess v. Reformed Pul'g Corp.*, 508 A.2d 1359, 1363 (Vt. 1986)). The reason for this rule is simple: "Reasonable readers would recognize that the

short excerpt of the news article [as encapsulated in a headline] does not tell the full story; and, if readers want the full story, they will scroll through the rest of the article." *Hogan v. Winder*, 762 F.3d 1096, 1110 (10th Cir. 2014).

Stated in full, the headline at issue reads "California has a $1 billion contract of PPE with BYD, a company controlled by the Chinese State." Ex. C. That is the statement at issue in paragraph 30 of the Complaint, serving as the predicate for the Second Cause of Action.

That headline accurately characterizes the contents of the article. The full blog post outlines BYD's billion dollar contract with the State of California for the production of personal protective equipment ("PPE"), as well as the set of circumstances that led to that contract. *See id*. Its headline references the incongruity that an electric car manufacturer would be manufacturing PPE at all: "BYD? The automaker? A $1 billion contract for medical equipment? Yes, BYD, the electric car manufacturer with deep ties to the Chinese government[.]" *Id*. The remainder of the text highlights some of the difficulties the various states have had locating American-made PPE, and also addresses the question "Why BYD?" In that final section, the State Control Story highlights some specifics of the contract and asks poignant questions about whether BYD will be able to meet its contractual obligations. *Id.* The headline fairly indexes the contents of the article and cannot, therefore, be considered separately from that content. Thus, the allegedly defamatory statement in the State Control Story is a non-actionable headline.

### b.  BYD Failed to Allege that AAM Acted with Actual Malice in Publishing the Statements Concerning BYD's Relationship with the Chinese Government

Like the Forced Labor Story, the State Control Story—on its face and as detailed therein—relies on a previously-published report by a reputable source for the statements challenged by BYD. The very phase upon which BYD based its claim ("deep ties to the Chinese government") embedded a hyperlink that directed the reader to an independent report that substantiates the

23

statement. *See* Radarlock, <u>Building the China Dream: BYD & China's Grand Strategic Offensive</u> (October 2019), ("Radarlock Report"). Ex. F.[18]

The Radarlock Report was written by China scholar Emily de La Bruyère. Ms. de La Bruyère, who graduated from Princeton University's Woodrow Wilson School, "leads Radarlock's China research and has pioneered novel collection and analysis tools for China data. She has published relevant commentaries in The Octavian Report, Bloomberg View, The Wall Street Journal, and The New York Times, among others." Ex. F, 4. The Radarlock Report credibly discusses China's efforts to seize the new energy vehicle industry. *Id.* at 5. It explicitly delineates the strategic alliance between BYD and the Chinese Communist Party. According to the Radarlock Report, BYD received approximately $328 million in government support in 2018 alone, and approximately $1.3 billion since 2007. *Id.* at 7.

The Radarlock Report further details BYD's close link with China's military apparatus, sharing "updates, fuel data, and vehicle monitoring" with the Ministry of Industry and Information Technology, "the State unit charged with military-civil fusion." *Id.* at 10. The Radarlock Report also details "older, more legacy, and more granular examples of BYD transferring data and information more broadly, to the [Chinese] State – and exporting the State's techno-economic

---

[18]     Although the Medium article reporting on referenced in the Radarlock Report that was the original hyperlink is no longer actively hosted on Medium's website, the Wayback Machine's Internet Archive records show that it was available on October 25, 2019 and shows a publication date of the same day. Radarlock, Report Release: CRRC and Global Rolling Stock Dominance, Medium                              (Oct.                    25,                    2019), https://web.archive.org/web/20191025170932/https://medium.com/radarlock/report-release-crrc-and-global-rolling-stock-dominance-c0c4f9bc4547 (last visited Feb. 1, 2021). *See Paleteria la Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 247 F.Supp.3d 76, 108-109 (D.C. Cir. 2017) (accepting evidence from the Wayback Machine). A true and accurate excerpt of Radarlock's report on CRRC is attached to the Stern Declaration as Exhibit H.

offensive internationally." *Id.* According to the Radarlock Report, BYD's leadership "boasts direct ties to the CCP's industrial policy apparatus and [Military-Civil Fusion] project." *Id.* at 15.[19]

AAM's reliance on, and citation to, a credible reference source for the statements concerning BYD's alleged links to the Chinese military and government, shows, as a matter of law, a lack of actual malice. Plaintiff does not plead otherwise. Thus, BYD's Second Cause of Action must be dismissed.

### D.  BYD Fails to Validly Allege Any of the Three Statements Were Made With Actual Malice

Notwithstanding that AAM relied on the Radarlock Report and ASPI Report, precluding a finding of actual malice as a matter of law, BYD has offered no support at all for its conclusory assertion that AAM's statements were made with actual malice. Compl. ¶¶ 26, 31. Rather, BYD asserts that "extensive information online [] establishes that BYD has private ownership and is not state-owned. Even many publicly-available news reports critical of BYD have conceded that point" Compl. ¶ 23. Whether BYD's statement is true or not does nothing to establish, much less adequately plead, the *subjective* standard of actual malice as to any of the Defendants.

Actual malice is a subjective standard and Plaintiff's Complaint does not meet the "daunting" standard required. *McFarlane*, 91 F.3d at 1508; *see also Hourani*, 164 F. Supp. 3d at 141. For example, nowhere does BYD allege that Defendants have reviewed or were aware of any of the alleged "extensive information online" detailing BYD's ownership, nor does it allege that AAM—had it reviewed that literature—in fact believes it or had serious doubts about the information it was posting. Plaintiff's failure is dispositive.

---

[19]     For the purposes of this Motion to Dismiss, AAM has limited its analysis here to the materials incorporated by reference in the Complaint. If this case moves beyond the Motion to Dismiss phase, AAM can and will produce abundant evidence demonstrating both its good faith reliance on the cited sources, as well as the factual accuracy of the at-issue statements.

Certainly, none of that information which BYD alleges would undermine the statements in the Complaint is cited in the ASPI Report or Radarlock Report—credible sources BYD concedes were relied upon by Defendants for the specific statements at issue. BYD has thus failed to adequately plead that AAM actually believed in the falsity of its statements, or entertained subjective doubts as to their truth. *See Hourani*, 164 F. Supp. 3d at 141. Given the obvious source material for each statement at issue, BYD does not even allege a failure by AAM to investigate these issues, which would still be insufficient to meet the "daunting standard" required for a valid claim of actual malice. *Gertz*, 418 U.S. at 332 ("[M]ere proof of failure to investigate, without more, cannot establish reckless disregard for the truth."). BYD acknowledges the references cited, and fails to allege that Defendants knew, or even suspected, that any of those references were false or lacking in credibility. That failure is fatal to any claim of defamation.

AAM relied in good faith on credible, well-researched, and well-cited independent reports for each of the three statements at issue in the Complaint. Those sources are apparent from the face of the Complaint. Regardless, BYD has failed to support its claims with a valid and credible allegation that any of the Defendants acted with actual malice in publishing the statements at issue. Thus, BYD has failed to plead the required element of actual malice and its defamation Complaint should be dismissed.

## III.    The Allegations in BYD's Complaint Related to the October 2019 Press Release Are Time Barred

BYD's claim concerning the Press Release statement attributed to Mr. Paul that BYD is "simply an arm of China's military and government," Compl. ¶ 21, fails for the separate and independent reason that it is untimely. BYD alleges that the Press Release is "undated." *Id.* In fact, the Press Release was published on October 25, 2019. Exs. D, G. Because that statement was published more than one year before BYD filed its November 25, 2020 Complaint, any claims

26

based on that statement are barred by the one-year statute of limitations for defamation actions, and must be dismissed.

The statute of limitations for a defamation claim in the District of Columbia is one year. D.C. Code § 12-301(4) (2001). That deadline is strictly applied at the pleading stage. *See, e.g., Mullin v. Wash. Free Weekly, Inc.*, 785 A.2d 296, 298 (D.C. 2001) (affirming dismissal of action based on statements published one year and three days before the action was filed). Defamation occurs at the time of initial publication, which is the date that the statute of limitations begins to run. *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 882 (D.C. 1998). For internet publication cases, the statute of limitations runs from the date of first publication, absent some modification that qualifies as "republication." *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1088 (D.C. Cir. 2007). Even third-party reproductions, however, may only constitute as "mere continuing impact from past violations that is not actionable." *Id*. (internal citations omitted).

The Press Release bears at least three objective markers showing that it was in fact published in October 2019, more than one year prior to BYD's November 25, 2020 filing date.

First, the publically available page source of the Press Release shows that the Press Release was published on October 25, 2019, and has not been modified since that date. A true and accurate excerpt of the page source is attached to the Stern Declaration as Exhibit G ("<meta property="article:published_time" content="2019-10-25T16:14:00+00:00" />").[20]

Second, when accessing the Press Release through the "Press Release directory" on AAM's website, the release date is clearly indicated as October 25, 2019:

---

[20]   As the Press Release is one of the fulcrums of Plaintiff's Complaint and is incorporated by referenced therein, the Court may take judicial notice of all aspects the Press Release, including its source code.



Third, the Press Release itself references "[n]ew research publicly unveiled today" and embeds a link to a (now-unavailable) *Medium* article that was published on October 25, 2019 discussing the October 2019 Radarlock Report. *See* Ex. H.

Because the Press Release was published more than one year prior to the date of the filing of BYD's Complaint, BYD has forfeited its right to challenge it as alleged defamation. While such a challenge would fail, the Court need not reach the merits in finding that the statute of limitations has lapsed. Thus, the Court should dismiss the portion of the Second Cause of Action, Compl. ¶ 30, based on the statement in the October 25, 2019 Press Release.

## IV.     The District of Columbia's Anti-SLAPP Statute Mandates Dismissal.

### A.  D.C. Anti-SLAPP Statute

The District of Columbia, the seat of our nation's democratic government, maintains a vigorous tolerance of dissenting ideas, especially on issues of public interest. As such, the D.C. Code contains express protections against litigation for those individuals and groups who express their views. Those protections are codified in D.C. Code Ann. § 16-5501, *et seq.* ("D.C. Anti-SLAPP"). The D.C. Anti-SLAPP statute is substantive (not procedural) and, therefore, should be applied by this Court sitting in diversity. *Erie Ry. Co. v. Tompkins,* 304 U.S. 64 (1938). The D.C.

28

Anti-SLAPP statute stands as a separate and independent basis upon which BYD's Complaint should be dismissed along with an award of costs and reasonable attorney's fees.

D.C. Code § 16-5502(a) states, "[a] party may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim." D.C. Code § 16-5502(b), in turn, explains,

> If a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be denied.

D.C. Code § 16-5504 allows a successful defendant of a D.C. Anti-SLAPP motion to recover "the costs of litigation, including reasonable attorney fees."

"A strategic lawsuit against public participation, or SLAPP, is 'an action filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view.'" *Saudi Am. Pub. Relations Affairs Comm. v. Inst. for Gulf Affairs*, 242 A.3d 602, 605 (D.C.) (quoting *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1226 (D.C. 2016)). "The D.C. Anti-SLAPP Act provides a party defending against a SLAPP with procedural tools to protect themselves from 'meritless' litigation." *Id.* (collecting cases).

In litigating this motion, a defendant must "make[ ] a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502(b). The statute defines an "[a]ct in furtherance of the right of advocacy on issues of public interest" to mean, in relevant part, "[a]ny written or oral statement made . . . [i]n a place open to the public or a public forum in connection with an issue of public interest." D.C. Code § 16-5501(1)(A)(ii). "Public interest," in turn, is broadly defined by the D.C. Code, to include any "issue related to health or safety; environmental, economic, or community well-being; the District

government; a public figure; or a good, product, or service in the market place." D.C. Code § 16-5501(3).

> Once the defendant has made this prima facie showing, which is not onerous, the burden shifts to the . . . plaintiff, who must demonstrate that the[ir] claim is likely to succeed on the merits. If the plaintiff cannot carry their burden, the defendant's motion must be granted and the lawsuit dismissed with prejudice.

*Saudi Am. Pub. Relations Affairs Comm*, 2020 WL 7250889, at *2 (quotations omitted).

### B. This Court Should Invoke the D.C. Anti-SLAPP Statute

This case provides the Court with ample cause to invoke the D.C. Anti-SLAPP statute, dismissing the case with prejudice and awarding Defendants the costs of litigation and reasonable attorney's fees. AAM, a non-profit organization representing American workers and American businesses, and three individual Defendants working in their employment capacities to advance the cause of American workers and American businesses, were sued by BYD, a Chinese company, for engaging in public discourse on matters of public interest—reported use of slave labor in the supply chain for companies selling products to US consumers, and potential influence and control of a foreign government for a China-based business.

BYD's use of litigation against AAM and the individual Defendants is, at best, questionable given that neither AAM nor the individual Defendants originated *any* of the statements at issue in this case. BYD concedes as much in the Complaint. It is AAM's reporting and summary of independent, third-party research in the ASPI Report and Radarlock Report with which BYD should direct its challenge, if anywhere. Yet BYD chose to sue AAM and three of its employees. It is AAM's mission, rather than its statements, that BYD has concerns with. The protection of AAM's advocacy voice and freedom of speech on issues relevant to the political and business realm is precisely the claims that the DC Anti-SLAPP statute is designed to address.

BYD has no likelihood for success on the merits. As detailed above, BYD's Complaint fails to properly allege damages to support subject matter jurisdiction, seeks compensation for statements that (as a matter of law) fail to meet the pleading standard for showing "actual malice," and relies upon a time-barred statement. For each of these reasons, BYD's two causes of action cannot meet the standard of showing a likelihood of success on the merits.

AAM recognizes that, in *Fairbanks*, this Court found the D.C. Anti-SLAPP statute inapplicable in federal court. 314 F. Supp. 3d at 95. AAM nevertheless makes a good faith request for reconsideration and/or extension of existing law for three reasons:

First, the applicability of the D.C. Anti-SLAPP statute in federal court remains unsettled. This Court in *Fairbanks* recognized that the D.C. Circuit has not definitively ruled on the issue of whether the D.C. Anti-SLAPP statute may be applied since the D.C. Court of Appeals decided *Mann*, 150 A.3d 1213 (D.C. 2016) (amended Dec. 13, 2018). *See Fairbanks*, 314 F. Supp. 3d at 93-95. Indeed, the issue of whether the D.C. Anti-SLAPP statute can apply in federal court post-*Mann* is squarely before the D.C. Circuit now in *Tah v. Glob. Witness Publ'g, Inc.*, No. 19-7132 (D.C. Cir. filed Oct. 25, 2019).[21]

Second, BYD's forum shopping should not be rewarded. As discussed in Section I, above, BYD has not adequately alleged damages to establish valid subject matter jurisdiction for a federal diversity matter. One could assume that BYD chose the federal, rather than District of Columbia, forum specifically because of the D.C. Anti-SLAPP statute and the dispositive impact it would have on this case. Should this case be dismissed for lack of jurisdiction and refiled in the Superior Court for the District of Columbia, the Anti-SLAPP statute would certainly apply. Because of that

---

[21]    Oral argument in *Tah* was held in September 2020, and the D.C. Circuit's decision is pending. Should it be published before this motion is decided, *Tah* could settle the issue and create binding precedent for this motion.

potentiality, AAM is compelled to raise and preserve this argument here to avoid any (baseless) future argument of waiver by BYD.

_Third_, and finally, while AAM recognizes this Court has held that _Abbas v. Foreign Policy Grp.,_ 783 F.3d 1328 (D.C. Cir. 2015), even after _Mann_, bars dismissal under the D.C. Anti-SLAPP statute, AAM urges the Court to reconsider given the egregious facts before it. BYD is a foreign company with objectively unquestionable ties to the Chinese government. BYD's supply chain has been identified as containing Uyghur slave labor by independent third-party sources. AAM, whose stated mission is public advocacy on behalf of American manufacturing, was engaging in clear First Amendment protected activities. BYD may not like that, but it cannot be permitted to use the federal courts to stifle the voices of AAM or the three individual employees named as defendants in this case.[22]

First Amendment jurisprudence protects the free exchange of ideas and supports the very statements meant to be guarded by the DC Anti-SLAPP statute. Without a penalty for filing its meritless Complaint, BYD will continue its rampage against free speech. The D.C. Anti-SLAPP statute was created for just such a purpose: to protect the free and fair exchange of ideas. Respectfully, given the facts before it, the Court should reconsider its position concerning the substantive nature of the D.C. Anti-SLAPP Statute and its applicability in this federal diversity case. The Court should grant Defendants' Motion, awarding AAM reasonable fees and costs.

---

[22]  This Court may take judicial notice that this is the second case BYD has filed in the last few months against organizations for making similar statements reported by reputable organizations. BYD filed a parallel suit on substantially similar grounds against Vice Media in the Southern District of New York a few months before this one. _BYD Company Ltd. v. Vice Media LLC_, No. 1:20-cv-03281 (S.D.N.Y. filed Apr. 27, 2020).

## CONCLUSION

For the forgoing reasons, Defendants respectfully request that the Court should grant AAM's Motion, dismissing the Complaint with prejudice.

DATED:  February 1, 2021

Respectfully submitted,

*/s/ Bezalel A. Stern*
Bezalel A. Stern (D.C. Bar # 1025745)
KELLEY DRYE & WARREN LLP
3050 K Street N.W., Suite 400
Washington, D.C. 20007
Tel.: (202) 342-8422
bstern@kelleydrye.com

Lauri A. Mazzuchetti (admission pending)
Paul A. Rosenthal (admission pending)
KELLEY DRYE & WARREN LLP
One Jefferson Road
Parsippany, NJ 07054
Tel.: (973) 503-5900
lmazzuchetti@kelleydrye.com
paulrosenthal@kelleydrye.com

*Counsel for Defendants Alliance for American Manufacturing, Scott Norman Paul, Cathalijne Adams, and Matthew McMullan*

33