UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BYD COMPANY LTD,**<br><br>                Plaintiff<br><br>        v.<br><br>**ALLIANCE FOR AMERICAN MANUFACTURING**, *et al.*,<br><br>                Defendants. | Case No. 1:20-cv-03458 (TNM) |

**MEMORANDUM OPINION**

BYD Company Ltd. has filed an amended complaint alleging defamation against a nonprofit organization, the Alliance for American Manufacturing, and several of its employees. As before, Defendants move to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim. The Court disagrees with their jurisdictional arguments but agrees that BYD fails to state a claim. The Court will dismiss the amended complaint without prejudice.

**I.**

BYD "is one of the world's largest producers and suppliers of electric vehicles including electric cars, buses, trucks, and forklifts, as well as solar panels, lithium batteries, and protective masks and equipment, among many other . . . products." Am. Compl. ¶ 1, ECF No. 22. The company is incorporated in and has its principal place of business in the People's Republic of China. *Id.* ¶ 5. The Alliance for American Manufacturing is "a non-profit organization that advocates in favor of American-made products." *Id.* ¶ 2. It is headquartered in Washington, D.C., and the individual employee-Defendants live nearby. *Id.* ¶¶ 6–9.

BYD alleges that the American Alliance for Manufacturing and its employees (collectively, the "Alliance") defamed it in three separate statements. *Id.* ¶¶ 19–22. The first

statement appeared in a blog post on the Alliance's website and claimed BYD "depend[ed]" on and "profit[ed] from" forced labor in China. Defs.' Mot. to Dismiss Ex. B ("Ex. B") at 2, 4, ECF No. 23-4.[1] The second statement, which also appeared in an Alliance blog post, questioned why California selected BYD, an "automaker," to produce medical equipment for the state under a $1 billion contract. Defs.' Mot. to Dismiss Ex. C ("Ex. C") at 3, ECF No. 23-5. The post catalogs many issues with BYD's performance under the contract and notes that BYD issued California a $500 million refund after its N95 masks failed to secure federal certification. *Id.* The third statement, from an Alliance press release, accused BYD of maintaining "links" to the Chinese government and military. Defs.' Mot. to Dismiss Ex. D ("Ex. D") at 2, ECF No. 23-6. The press release quoted Alliance President Scott Paul, who claimed U.S. lawmakers had "irrefutable evidence" that BYD is "simply an arm of China's military and government." *Id.*

The Court dismissed BYD's first complaint because it failed to allege damages that met the jurisdictional threshold for diversity cases. *See BYD Co. Ltd. v. All. for Am. Mfg.*, No. 1:20-CV-03458 (TNM), 2021 WL 1564445, at *1 (D.D.C. Apr. 21, 2021). In its amended complaint, BYD claims it "suffered extensive, specific damages as a result of the Defendants' statements" and lists several contracts it allegedly lost due to the Alliance's defamation. Am. Compl. ¶¶ 24–26. BYD alleges that the Alliance made all three statements with actual malice, *id.* ¶ 27, and it seeks compensatory and punitive damages, permanent injunctive relief, and costs, *id.* ¶ 37. The Alliance moves to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). *See* Defs.' Mot. to Dismiss the Am. Compl. ("Mot. Dismiss"), ECF No. 23. The motion is now ripe.

---

[1] All citations are to the page numbers generated by this Court's CM/ECF system.

## II.

To survive a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of proving that the Court has subject matter jurisdiction to hear its claims. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). In evaluating a motion to dismiss under Rule 12(b)(1), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff[s] the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (cleaned up). A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts the complaint's factual allegations as true and grants the plaintiff "all inferences that can be derived from the facts alleged." *L. Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017) (cleaned up). The Court need not, however, credit "a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (cleaned up). The Court considers "only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [it] may take judicial notice." *Hurd*, 864 F.3d at 678 (cleaned up).

Rule 12 plays an especially important role in defamation cases, such as this one. "The Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl v. Bureau of Nat'l Affairs, Inc.* 856 F.3d 106, 109 (D.C. Cir. 2017) (cleaned up). "Early resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First

Amendment rights that doing so will not needlessly become prohibitively expensive." *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 89 (D.D.C. 2018) (internal citation omitted).

### III.

BYD maintains the Court has diversity jurisdiction over this case. *See* Am. Compl. ¶ 10. Diversity jurisdiction requires an amount in controversy exceeding $75,000 and, as relevant here, a dispute between "citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2).[2] The Alliance does not contest jurisdiction based on citizenship. Instead, it argues BYD "has once again failed to plead facts sufficient to establish that it suffered any cognizable damages as a result of the Alliance's statements." Mot. Dismiss at 1. Specifically, the Alliance contends BYD fails to show *how* the Alliance's statements harmed BYD. *Id.* And even if it could make this showing, the Alliance argues BYD would still flunk the amount-in-controversy requirement because the National Defense Authorization Act for FY 2020 (NDAA) "created a massive barrier to BYD's ability to compete" for the very contracts it says it lost because of the Alliance's alleged defamation. Defs.' Mem. in Supp. of Mot. to Dismiss the Am. Compl. ("Defs.' Mem.") at 7, ECF No. 23-1.

The Court considers (A) whether BYD's pleadings meet the amount-in-controversy threshold, and (B) the effect of the NDAA.

### A.

BYD added three paragraphs to its amended complaint that contain specific allegations of lost profits resulting from the Alliance's statements. *First*, BYD claims it "has not been able to complete two contracts to sell electric buses to two major urban transit companies in the United

---

[2] As in its original complaint, BYD mistakenly cites 28 U.S.C. § 1332(a)(1). Compl. ¶ 10, ECF No. 1; Am. Compl. ¶ 10. This provision does not apply because BYD is a foreign corporation. The Court construes BYD's amended complaint as seeking jurisdiction under § 1332(a)(2).

4

States." Am. Compl. ¶ 24. *Second*, BYD claims it "lost a potential contract in 2021 with the Utah Transit Agency, which would have netted BYD approximately $44 million dollars." *Id.* ¶ 25. *Third*, BYD claims "other potential customers . . . have indicated to BYD a reticence to deal with the company because of the public controversy that resulted from Defendants' false statements." *Id.* ¶ 26.

The Alliance maintains these are mere assertions and that BYD does not show *how* the Alliance's speech cost it business. Defs.' Mem. at 15–18. The Alliance argues that the Court "need not accept inferences drawn by the plaintiff . . . if those inferences are unsupported by facts alleged in the complaint or amount to merely legal conclusions." Defs.' Mem. at 16 (quoting *Rosenkrantz v. Inter-Am. Dev. Bank*, No. CV 20-3670 (BAH), 2021 WL 1254367, at *6 (D.D.C. Apr. 5, 2021)). In the Alliance's telling, BYD is alleging supposedly defamatory statements and purported injuries but not explaining causality—it's asking the Court to fill in the blanks.

But the law is generous to plaintiffs on amounts in controversy. To justify dismissal, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938). "[T]he Supreme Court's yardstick [in *St. Paul Mercury*] demands that courts be very confident that a party cannot recover the jurisdictional amount before dismissing the case for want of jurisdiction." *Rosenboro v. Kim*, 994 F.2d 13, 17 (D.C. Cir. 1993). Thus, at the motion-to-dismiss stage, a court "should find jurisdiction . . . even if it has serious doubts as to the bases for establishing an amount-in-controversy." *Bronner v. Duggan*, 317 F. Supp. 3d 284, 288 (D.D.C. 2018).

This is a low bar for BYD to surmount. Given the amount of BYD's alleged losses and the Court's duty to "treat the complaint's factual allegations as true . . . [and] grant plaintiff the

5

benefit of all inferences that can be derived from the facts alleged," the Court finds that BYD has now met the amount-in-controversy requirement. *Sparrow*, 216 F.3d at 1113 (cleaned up).

**B.**

Next, the Alliance contends that the NDAA "*effectively* prohibits municipal transit agencies . . . from pursuing business with certain qualifying companies, such as BYD." Defs.' Mem. at 20 (emphasis added). Because the contracts at issue are between BYD and municipal agencies, and because Congress added the NDAA language "before any of the allegedly defamatory statements were published," the Alliance argues its statements could not have had any effect on BYD's contracts. *Id.*

But the Alliance puts a lot of weight on the word *effectively*. All the Alliance shows is that the NDAA *might* have affected BYD's contracts. And in any event, the NDAA has a two-year phase-in period during which municipalities can keep purchasing rolling stock from companies such as BYD. *See* 49 U.S.C. § 5323(u)(5)(B) ("[T]his subsection . . . shall not apply to the award of a contract or subcontract made by a public transportation agency with any rolling stock manufacturer for the 2-year period beginning on or after the date of enactment of this subsection."). By the Alliance's own account, the President signed the NDAA into law in December 2019. *See* Defs.' Mem. at 20. Thus, the NDAA could not have affected any of BYD's sales before December 2021.

The Court has jurisdiction and turns next to the Alliance's 12(b)(6) arguments.[3]

---

[3] BYD claims it is improper to consider the Alliance's 12(b)(6) arguments because the Court's April 21, 2021 Order "granted Defendants' motion on the sole ground of subject matter jurisdiction and denied the remainder." Pl.'s Mem. of P. & A. in Opp'n to Defs.' Second Mot. Dismiss ("Pl.'s Mem. Opp'n") at 17, ECF No. 24. Not so. "When a defendant files a motion to dismiss under Rule 12(b)(1) and Rule 12(b)(6), this Circuit has held that the court must first examine the Rule 12(b)(1) challenges, because if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not

### IV.

Because of First Amendment protections, courts scrutinize defamation cases "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). This is especially true when, as here, the plaintiff is a public figure.[4] Protected speech against public figures can "include vehement, caustic, and sometimes unpleasantly sharp attacks." *Id.*

"Under District of Columbia law, a defamation claim requires: (1) a false and defamatory statement; (2) published without privilege to a third party; (3) made with the requisite fault; and (4) damages." *Fairbanks*, 314 F. Supp. at 90. To plead "requisite fault," a public figure must allege "that the defendant published the defamatory falsehood with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988) (cleaned up). "Reckless disregard" means that the speaker acted with a "high degree of awareness of [the statement's] probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). This is a "subjective" standard. *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996).

The Alliance argues that BYD failed to adequately plead that it made any of its three allegedly defamatory statements with actual malice. Mot. Dismiss at 2. It submitted several exhibits in support of its arguments. BYD responds that the Court should not consider any of

---

need to be determined." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 64 (D.D.C. 2011) (cleaned up). The Court did not reach the merits of the 12(b)(6) arguments in its prior order because it determined it lacked jurisdiction. Only now that BYD has overcome the 12(b)(1) hurdle must the Court consider 12(b)(6).

[4] BYD concedes it is "at least a limited purpose public figure." Pl.'s Mem. Opp'n at 19 n.3.

them, arguing "Defendants' Exhibits are *not* documents attached as exhibits or incorporated by reference in the Complaint." Pl.'s Mem. Opp'n at 19 n.2.

The Court disagrees. The Alliance's first five exhibits consist of the three articles containing the allegedly defamatory statements at issue plus two research reports that served as the impetus for the Alliance's statements. Decl. of Bezalel A. Stern in Supp. of Defs.' Mot. to Dismiss the Am. Compl. ("Stern Decl.") ¶¶ 2–6, ECF No. 23-2. One of these research reports, the ASPI Report, is mentioned by name in BYD's amended complaint. Am. Compl. ¶¶ 15–18. The Alliance's sixth and final exhibit is the source code for one of the blog posts containing one of its allegedly defamatory statements. Stern Decl. ¶ 7. The source code is part of the blog post. BYD thus incorporated all these exhibits into its amended complaint. And despite repeatedly arguing that the Alliance fails to provide legal authorities establishing that its exhibits are part of the record, BYD never disputes their authenticity. The Court will therefore consider them in adjudicating the Alliance's FRCP 12(b)(6) motion. *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) ("It is also clear that these documents—which were appended to [Defendant's] motion to dismiss and whose authenticity is not disputed—may be considered here because they are referred to in the complaint and are integral to [Plaintiff's] conversion claim.").

The Court next addresses each of the Alliance's statements in turn.

### A.

The Alliance's first allegedly defamatory statement appeared in a March 2020 blog post on the Alliance's website. The post, titled "Some of the World's Biggest Brands Depend on Forced Labor" (Forced Labor Story), reports on purported associations between global brands and Uyghurs in China who had allegedly been "transferred from re-education camps to a network of 27 Chinese factories for state-sponsored forced labor." Ex. B at 3. The blog post

8

links to articles published by Reuters and the New York Times, but its primary source and focus is a report written by the Australian Strategic Policy Institute (ASPI). *Id.* The post's sole reference to BYD states: "It should come as little surprise that several known bad actors are also profiting from this forced labor, including . . . Build Your Dreams (BYD)." *Id.* at 4.

BYD contends that the Forced Labor Story "is not supported by any facts whatsoever, including any facts contained in the ASPI report." Am. Compl. ¶ 19. Calling the Forced Labor Story "a complete fabrication by Defendants," BYD states that "all ASPI reported is that BYD had business dealings with a company (Dongguan) that happens to own a subsidiary (Hubei) that allegedly used forced labor. . . . BYD, in fact, has not had any business dealings with Hubei." *Id.* ¶ 20. In BYD's telling, a close reading of the ASPI Report provides "support for the proposition that Defendants did not rely in good faith on the ASPI Report when they wrote and published the Forced Labor Story, and in fact entertained serious doubts as to the truth of Defendants' own statements about BYD." Pl.'s Mem. Opp'n at 21.

But more is needed. BYD pleads no nonconclusory facts alleging the Alliance knew what it was reporting was false or questioned its truth. *See Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 141 (D.D.C. 2016) ("To allege actual malice, a plaintiff must assert that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement.") (cleaned up), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017). The closest BYD comes to pleading actual malice is its claim that because the Alliance "linked [to] the ASPI Report [in] the Forced Labor Story, [it] must have known that the ASPI Report did not establish that BYD profited in any way from forced labor." Am. Compl. ¶ 27.

More, even granting BYD's contention that the Alliance misrepresented the ASPI Report, it does not reasonably follow that the Alliance knew it was misrepresenting it. It is just as

9

likely—if not more—that the Alliance merely had a different interpretation of the ASPI Report. BYD offers a barely disguised legal conclusion. And the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (cleaned up).

BYD doubles down on this argument in its briefing. It explains that "[t]he theory of actual malice pleaded is that [the Alliance] had the ASPI Report in [its] possession, obviously read it, and yet . . . knowingly or recklessly wrote and published two statements that completely misstated the conclusions of the ASPI Report. . . . It is an entirely reasonable inference that [the Alliance] . . . entertained serious doubts about the truth of such statements." Pl.'s Mem. Opp'n at 19. Once more, BYD asserts the Alliance must have acted knowingly or recklessly just because its statements were (according to BYD) false. But if BYD's pleadings were sufficient, there would be no reason for courts to require plaintiffs to show defendants spoke with "knowledge that [their speech] was false or with reckless disregard of whether it was false or not." *Liberty Lobby*, 838 F.2d at 1292 (cleaned up). A court could assume the requisite state of mind if a plaintiff pled that a defendant's statements were false.

The Court will not accept BYD's invitation to rewrite the law of defamation. To draw reasonable inferences in BYD's favor, the Court needs facts alleging the Alliance's awareness of, or disregard for, the truthfulness of its statement. BYD gives the Court only speculation.

This speculation is especially glaring considering the ASPI Report's ample support for the Forced Labor Story's claim about BYD. The ASPI Report's Executive Summary states: "ASPI's research has identified 83 foreign and Chinese companies directly or indirectly benefitting from the use of Uyghur workers outside Xinjiang through potentially abusive labour [sic] transfer programs as recently as 2019: . . . BYD." Defs.' Mot. to Dismiss Ex. A ("Ex. A")

at 8, ECF No. 23-3.  Elsewhere, the ASPI Report states that 105 Uyghur workers were transferred to Hubei, a subsidiary of Dongguan, which in turn directly supplies BYD.  *Id.* at 37.  BYD claims this relationship is too attenuated to show that it benefits from forced labor, and it maintains that it has no relationship with Hubei.  Am. Compl. ¶ 20.  But Figure 17 of the ASPI Report contradicts this claim and depicts Hubei directly supplying BYD.  Ex. A at 27.

The ASPI Report also provides endnotes for many of its claims.  BYD contends that the endnotes do not provide enough support.  Pl.'s Mem. Opp'n at 21.  But to defeat a defamation claim, the Alliance need not have tracked down and verified that each endnote supports each claim.  Because the actual malice standard is subjective, what matters is not whether the endnotes *actually* support the claims in ASPI's Report but whether the Alliance *thought* they did.  *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968) (analyzing whether "defendant in fact entertained serious doubts as to the truth of his publication").

To be sure, the Forced Labor Story applies its own veneer to the ASPI Report.  The Story reports that BYD "profit[s]" from forced labor, for example.  Ex. B at 4.  The word "profits" does not appear in the ASPI Report.  But the ASPI Report does say BYD "directly or indirectly benefit[s]" from forced labor.  Ex. A at 8.  And BYD must plead the existence of more than minor linguistic differences to make out a claim for defamation.  *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 600–01 (D.C. Cir. 1988) ("[M]inor inaccuracies will not give rise to a defamation claim when the ultimate defamatory implications are themselves not actionable. . . . [A]ctual malice is not established in cases in which the statement is substantially accurate").

BYD fails to make out a claim for defamation as to the Alliance's first statement.

**B.**

The Alliance's second allegedly defamatory statement is another blog post. The post, titled "California has a $1 Billion Contract for PPE with BYD, a Company Controlled by the Chinese State," was published in the early days of the COVID-19 pandemic. Ex. C at 2. It focuses on the lack of American-made personal protective equipment (PPE) and individual states' difficulties in acquiring medical supplies. *Id.* at 3–7. Illinois, for example, "was able to get some [PPE] out of China by handing some dude a $3.4 million check in a McDonald's parking lot off I-55." *Id.* at 4. The post acknowledges that, with stories such as these, the need for PPE was dire. But it asks why BYD, an "automaker," is now manufacturing medical supplies. *Id.* at 3. And it highlights the company's early woes, including its failure to receive federal certification for its N95 masks. *Id.* This failure forced BYD to refund California $500 million. *Id.*

BYD's primary complaint about the post is its headline, claiming that BYD is "controlled" by the Chinese government. Am. Compl. ¶ 21. Pointing to "extensive information online that establishes that BYD has private ownership and is not state-owned," BYD quotes *McFarlane* for the proposition that "[a]lthough failure to investigate will not alone support a finding of actual malice . . . the purposeful avoidance of truth is in a different category." Pl.'s Mem. Opp'n at 22–23 (quoting *McFarlane*, 91 F.3d at 1510).

But BYD alleges no facts showing the Alliance's awareness of BYD's purported private ownership. *See McFarlane*, 91 F.3d at 1508 ("[B]ecause the actual malice inquiry is subjective . . . the inference of actual malice must necessarily be drawn solely upon the basis of the information that was available to *and considered by the defendant* prior to publication.") (emphasis added). BYD baldly asserts that the Alliance "*knew* that BYD is a private

12

corporation" and "[n]evertheless . . . knowingly or recklessly wrote and published the false statements." Pl.'s Mem. Opp'n at 22 (emphasis in original). This is a legal conclusion and does not pass muster.

More, the Radarlock Report is full of allegations that reasonably could have led the Alliance to the *opposite* conclusion. The Report, titled "Building the China Dream: BYD & China's Grand Strategic Offensive," Defs.' Mot. to Dismiss Ex. E ("Ex. E") at 2, ECF No. 23-7, states, among other things, that:

- BYD is "part of a government-directed and -supported 'innovation center' that seeks explicitly to combine 'domestic and foreign resources' to build up a Chinese-dominated next-generation vehicle industry." *Id.* at 7.

- The Company's leadership "boasts direct ties to the [Chinese Communist Party's] industrial policy apparatus and [military-civil fusion] project." *Id.*

- A joint venture between BYD and a state-owned electronics company "helps the State to integrate and guide the various technological arms that Beijing deploys and combines in the Network Great Power Strategy." *Id.* at 11–12.

- "In 2018, [BYD] announced 'strategic cooperation' with the China Academy of Launch Vehicle Technology . . . the largest research and production base of missile weapons and launch vehicles in China. Press releases from the time announced this cooperation as a 'new step' for both entities in 'military-civil fusion' (MCF)." *Id.* at 13.

- "BYD—through the web of state- and military-affiliated entities that it supports—allows Beijing access to and a position of leverage over global supply chains, technology flows, and, ultimately, data." *Id.* at 17.

The Alliance's claim that BYD is "control[led]" by the Chinese government is a reasonable gloss on these statements. Ex. C. Even granting BYD's claim that it is a private company, the Court agrees that "[b]eing a private corporation . . . is not exclusive of, or a bar against, being 'under the control of' or being an 'arm of the state.'" Reply in Supp. of Defs.' Mot. to Dismiss ("Repl. Supp. Mot. Dismiss") at 15, ECF No. 25. Especially in China. Even if this were a close call, under the First Amendment, close calls go against public figures. *See*

*Fairbanks*, 314 F. Supp. 3d at 90 ("The First Amendment requires public figures suing in defamation to demonstrate by at least a fair preponderance of the evidence that the allegedly defamatory statement is false, with close cases decided against them.") (cleaned up).  BYD thus does not plausibly allege the Alliance's second statement was defamatory.

## C.

The Alliance's third allegedly defamatory statement is in a press release.  The release bears the title, "Congress Must Act After New Evidence Links CRRC and BYD to Chinese Government and Military."  Ex. D.  It cites the same Radarlock Report discussed above, and it says that BYD "is both deeply subsidized by Beijing and work[s] hand-in-hand with Party leaders, China's military, and Huawei to penetrate the U.S. market."  *Id.* at 2.  The press release quotes the Alliance's President Scott Paul as saying that U.S. lawmakers "now have irrefutable evidence that CRCC and BYD are simply an arm of China's military and government."  *Id.*  It also urges Congress to block BYD's sales in the United States, citing "the wealth of new evidence linking CRRC and BYD to China's 'military-civil fusion' regime that leverages China's commercial and military capabilities in an effort to dominate the U.S. market."  *Id.* at 3.

Invoking now-familiar arguments, BYD contends the press release is defamatory because "BYD is not an 'arm' of either China's military or its government" but "is a privately held, privately run corporation that happens to be chartered and located in mainland China."  Am. Compl. ¶ 22.  BYD alleges—without pleading any supporting facts—that the Alliance published the press release "in an effort to spread mistruths about BYD . . . and thereby encourage discrimination against BYD and its products to impede its ability to compete fairly in the marketplace for supply contracts in the United States."  Pl.'s Mem. Opp'n at 22.  The Alliance

14

must have known its statements were false, BYD claims, because "there is extensive information online that establishes BYD has private ownership and is not state-owned." *Id.* at 22–23.

BYD does not plead the Alliance possessed subjective knowledge of the "extensive information online" purportedly showing BYD's private ownership. *See McFarlane*, 91 F.3d at 1508 ("[T]he actual malice inquiry is subjective."). If BYD meant to argue that the Alliance ignored this information or failed to investigate—and therefore acted recklessly—it misconstrues the standard. *See Hourani*, 164 F. Supp. 3d at 141 ("It is not enough to prove simply that the defendant failed to investigate or check the accuracy of a false statement, he must have had a subjective awareness of the probable falsity of the publication.") (cleaned up). Recall that the Radarlock Report contained ample information to support the claim that BYD has ties to the Chinese government and military. *See supra* IV.B.

In any event, BYD's claim about the press release is time-barred. The statute of limitations for defamation claims in the District is one year. D.C. Code § 12-301(4) (2019). "Defamation occurs on publication, and the statute of limitations runs from the date of publication." *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 882 (D.C. 1998) (cleaned up). As explained below, the press release was published on October 25, 2019. BYD therefore needed to sue prior to October 25, 2020, but it did not file its initial complaint until a month later. *See* Compl.

BYD argues the Alliance's press release is undated, but the Alliance provides three indicators of its date: (1) publicly available source code; (2) a screenshot of the press release with the date included; and (3) a link to a dated external article published the same day as the press

release.  Because the external article is no longer available, the Court only relies on the first two indicators.

BYD rejects the source code as evidence because "[n]o authority is cited" for the proposition that source code "is the proper subject of judicial notice."  Pl.'s Mem. Opp'n at 26.  But a court "may take judicial notice of facts contained in public records of other proceedings, and of historical, political, or statistical facts, and any other facts that are verifiable with certainty."  *Johnson v. Comm'n on Pres. Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2016) (cleaned up).  Anyone with a web browser can view a webpage's source code, so it is "verifiable with certainty."  And notably, BYD does not dispute the validity of the source code.  Instead, BYD argues that the Alliance does not "take into account the possibility that the Press Release was subsequently modified in a manner to qualify as republication."  Pl.'s Mem. Opp'n at 26.  Citing *Jankovic v. International Crisis Group*, 494 F.3d 1080 (D.C. Cir. 2007), BYD explains that if the Alliance modified and republished the webpage, it could reset the statute of limitations to run from the date of republication.  *Id*.

Several problems doom BYD's argument.  *First*, BYD forgets that it bears the burden of pleading sufficient "factual content [to allow] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  BYD pleads no facts from which the Court can infer that the Alliance republished or even might have republished the press release.  It only raises the "possibility" that the press release was republished.  Pl.'s Mem. Opp'n at 26.  The Court will not draw inferences based on mere possibilities.

*Second,* BYD does not even address the screenshot of the press release the Alliance included in its memorandum in support of its motion to dismiss.  *See* Defs.' Mem. at 35.  Instead, BYD claims the Alliance "concede[s]" that the press release is "undated," and for support cites

its *own* complaint. *See* Pl.'s Mem. Opp'n at 25. The Alliance concedes no such thing. Instead, the Alliance directs the Court to access the press release through the "Press Release directory" on its website. Defs.' Mem. at 35. Accessed this way, the press release shows it was published on October 25, 2019. *Id.*

The Court finds the date of the press release is not subject to "reasonable dispute" and takes judicial notice that the press release was published on October 25, 2019. *Hurd,* 864 F.3d at 686. BYD's claim about the press release is time-barred.

## V.

The Alliance asks the Court to dismiss the complaint with prejudice. Mot. Dismiss at 2. But "[a] dismissal *with prejudice* is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (cleaned up). It remains possible that BYD can cure the deficiencies in its complaint by alleging facts showing that the Alliance published its two blog posts with actual malice.

For these reasons, the Alliance's motion to dismiss will be granted in part, and the court will dismiss BYD's complaint without prejudice. BYD has now had two bites at the apple. It should expect that a third bite would be its last.

Dated: August 6, 2021                                             TREVOR N. McFADDEN, U.S.D.J.